### In re MARCUS et al.

#### (District Court, S. D. New York. December 18, 1911.)

1. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FALSE OATH.

On the question whether a bankrupt had made a false oath so as to justify the court in refusing his discharge, it is immaterial that he subsequently corrects his testimony by telling the truth, except in so far as it throws light on what his actual intention or understanding was when he made the first statements.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

2. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FALSE OATH—INTENT.

It is nevertheless open to him to show from the whole testimony whether his statement, though actually false, was not intended to mislead on a material fact.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

3. BANKRUPTCY (§ 408*)—REFUSAL OF DISCHARGE—FALSE OATH—DENIAL OF INSOLVENCY.

Statements by a bankrupt that he did not know the financial condition of his firm, that he did not know that his debts were over $30,000, and that he knew what he owed this firm and that firm and that it was a good deal more than the insurance moneys, did not amount to a denial of insolvency on the question whether he had made a false oath.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

4. BANKRUPTCY (§ 409*)—REFUSAL OF DISCHARGE—FAILURE TO KEEP BOOKS.

In order to prevent a discharge in bankruptcy, it must be shown not only that the bankrupt intended to keep the kind of books he kept, but also that he intended such books to conceal his financial condition.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 409.*]

In the matter of Morris Marcus and Emilius W. Scherr, bankrupts. On application for discharge. Granted.

----

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Myers & Goldsmith, for bankrupts.
Lloyd & Maddox and Noble & Camp, for creditors.

HAND, District Judge. [1] Under the specifications of a false oath, I do not think it of any consequence that no jury would in fact convict Marcus of perjury on the testimony at the first meeting; the sole question is whether the bankrupt knowingly and fraudulently made a false oath in any proceeding in bankruptcy, and whether this is proved clearly and substantially to the satisfaction of this court. I cannot agree with the learned master that it is in the least material that the bankrupt subsequently corrects a false oath by telling the truth, except in so far as it throws light upon what his actual intention or understanding was when he made the first statements. Suppose that the correction had occurred at a separate session of the first meeting of creditors, surely no one would say that such a fact was material. Suppose he first testified falsely and was afterwards broken down by cross-examination into a confession. Once he has given material testimony, which he intends to have taken as such in the case, and which he knows to be false, the crime is complete, whatever may be his subsequent atonement.

[2] Although, therefore, I cannot agree that it is of consequence what efforts he makes to correct the testimony, it is nevertheless open to the bankrupt to show from the whole testimony whether his testimony, if actually false, was not intended to mislead upon a material point, and that will be likely, if immediately after giving the false testimony he frankly admits the material facts.

[3] Marcus finally conceded that on January 3, 1909, he went over the books and knew how much he owed and that he knew that his assets were less than his liabilities. That was some 24 pages of testimony after the first statements which he made and which are those that the objectors rely on. What were those statements? They were: First, that from January to April he did not know the financial condition of the firm, a very vague term; and, second, that he did not know that his debts were over $30,000, that he knew what he owed this firm and that firm and that it was a good deal more than the insurance moneys. The upshot of this, read fairly, and not verbally, is that he did know that he was insolvent, but did not know the amount of his indebtedness. Now, the material inquiry was whether he knew that he was insolvent, for that was all that counted so far as the payments were concerned. It was of no consequence whether his debts were twice the amount of his assets, provided they were clearly larger. The fairer interpretation of his testimony is that, while he was not a very frank or willing witness, he never meant to deny the important fact which the examiner wanted to get from him, which was that he knew of his insolvency when he paid his wife and the other creditors. He may have fenced somewhat, and even said things which were not true; but they were perfectly immaterial to the point that both knew was the important point, and that he always intended to admit, and did admit, as soon as it was squarely put to him.

[4] As to the other specification, I agree wholly with the master. The intent to conceal one's financial condition is a separate fact from

the keeping of the books. The reasonable consequences of keeping imperfect books may be a concealment of one's financial condition, if the occasion ever arises when they are scrutinized, and that fact would be enough to charge one with responsibility for that result, if the law forbade keeping imperfect books. The general intent of the criminal law is of this kind, it only means that the actor must be aware of his acts and then charges him with such consequences as would naturally follow from them, regardless of whether he had those in mind or not. When, however, as is sometimes the case, the law attaches no responsibility to an act unless the actor does have in mind the specific consequences, it is necessary as an additional element to prove that state of mind. This is such a case. Moreover, since the intent to conceal is different from the intent to keep imperfect books, the objectors must go further than to show merely that the bankrupts intended to keep the kind of books they kept; for they must show, also, that they intended those books to conceal from somebody—which must be their creditors—their financial condition. That involves not only knowledge of how the books were kept, but some anticipation that at a future time they might be examined by creditors and would then fail to enlighten them upon all the facts. Re Garrison, 149 Fed. 178, 79 C. C. A. 126; Re Haskell (D. C.) 164 Fed. 301; Re Idzall (D. C.) 96 Fed. 314; Re Brice (D. C.) 102 Fed. 114; Re Brockman (D. C.) 168 Fed. 1015. I cannot follow Re Alvord (D. C.) 135 Fed. 236; nor some of the dicta in Re Goldich (D. C.) 164 Fed. 882, and Re Brod (D. C.) 166 Fed. 1011. Of course the proof of intent must almost always be indirect. Re Feldstein (D. C.) 115 Fed. 269; Re Schachter (D. C.) 170 Fed. 683.

As to Scherr, he knew nothing of the books at all. As to Marcus, he knew of them and how they were kept, and he knew that they contained no inventory, which is the omission relied upon. If the intent necessary was an intent to keep books without an inventory, Marcus would have had it and Scherr not. But the intent must be to conceal his financial condition, and it appears neither that Marcus knew that the failure to enter an inventory did make his financial condition unascertainable, nor that he supposed when the inventory was omitted that the occasion would ever arise when his creditors or any one else would want to examine his books. The presence of each element in his mind was necessary to his intent, for he must be found to have thought that by omitting to enter an inventory he would keep dark from some one else some of the facts.

Report confirmed, and both bankrupts discharged. No costs.